[Civ. No. 27190. First Dist., Div. One. Apr. 5, 1972.]

EDWARD LANDBERG, Plaintiff, Cross-defendant and Respondent, v. ROSLYN R. LANDBERG, Defendant, Cross-complainant and Appellant.

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

## COUNSEL

Severson, Werson, Berke & Melchior, Severson, Werson, Berke & Bull and Kurt W. Melchior for Defendant, Cross-complainant and Appellant.

Cunningham, Wolf & Churchill, David L. Cunningham, Creighton H. Churchill and Walter H. Medak for Plaintiff, Cross-defendant and Respondent.

## OPINION

**MOLINARI, P. J.**—This is an appeal from an order in a divorce action denying defendant and cross-complainant (hereinafter "defendant") Roslyn Landberg's motion for an order declaring that she had exercised her right to buy plaintiff and cross-defendant (hereinafter "plaintiff") Edward Landberg's stock in two corporations pursuant to the provisions of an agreement entered into between them, and between them and said corporations.

Plaintiff has not filed a respondent's brief. Therefore, pursuant to rule 17(b) of the California Rules of Court, we accept as true the statement of facts in defendant's opening appellant's brief. Defendant has not requested oral argument. Accordingly, under rule 17(b), the case is deemed submitted to us for decision on the record and on defendant's opening brief.[1]

---

[1]Plaintiff has requested oral argument. Under rule 17(b) of the California Rules of Court only the appellant may request oral argument where the respondent has not filed a brief.

*Motion For Reversal*

During the pendency of this appeal defendant made a motion for a reversal of the order appealed from upon the ground that plaintiff had stipulated to such a reversal on the basis that the litigation between the parties had been settled. The motion is predicated on a letter addressed to defendant's counsel by plaintiff's then counsel and bearing plaintiff's approval. The contents of said letter are set forth in the margin.[2] Following the filing of said motion and argument thereon, we directed the respective parties to show cause why the appeal should not be dismissed on the ground that it has become moot for the reason that the differences respecting the subject matter of this appeal had been adjusted during the pendency of the appeal. In his declaration in response to said order to show cause plaintiff does not deny the execution of the letter hereinabove referred to but asserts that it was only a conditional offer of possible settlement. Defendant in her declaration in response to said order to show cause, while asserting that a tentative settlement was reached between the parties, concedes that a final settlement was never formalized. Defendant asserts, moreover, "that in the ultimate analysis it will require an order of Court" to establish that a final settlement was reached.

■ An appeal may be dismissed as moot because the litigation between the parties has been settled. (*General Petroleum Corp.* v. *Beilby,* 213 Cal. 601, 604 [2 P.2d 797]; 6 Witkin, Cal. Procedure (2d ed. 1966) § 463, p. 4419.) ■ Moreover, this court has the power to entertain a motion for reversal in a proper case. (*Estate of Davis,* 8 Cal.2d 11, 12 [62 P.2d 582, 63 P.2d 827]; *Barton* v. *Maal,* 12 Cal.App.2d 353, 354 [55 P.2d 529]; *Melancon* v. *Walt Disney Productions,* 127 Cal.App.2d 213, 214-215 [273 P.2d 560].) ■■ Here the motion for reversal is predicated upon the alleged settlement. We conclude that such motion may not be granted,

---

[2]"Dear Mr. Melchior:

"Pursuant to our telephone conversation of this date [March 30, 1970] I am writing to confirm that Edward Landberg is no longer pursuing the appeal of the above-matter and we will stipulate that the Order of Judge Sutton can be reversed and it will be entered that Mr. Landberg's stock is to be redeemed by Mrs. Landberg.

"Pending the negotiations for final settlement of the matter, Mrs. Landberg has full authority to sell or lease the Gateway Theater in San Francisco and Mr. Landberg is agreeable to signing any papers necessary to facilitate such sale or lease of the Gateway Theater.

"Sincerely,
/s/ Colette M. Samuelson
"COLETTE M. SAMUELSEN
"CMS:sal

"APPROVED:
/s/ Edward Landberg
"EDWARD LANDBERG
"Dated: 30 March, 1970."

nor may this appeal be dismissed as moot, since we cannot say as a matter of law that the case has been settled. The language of the letter, when considered with the declarations, leaves the matter in the posture where the question whether a final settlement has been reached is a matter depending on the determination of factual issues to be resolved by a fact finding tribunal.

### Statement of the Case

On August 22, 1967, an interlocutory decree of divorce was granted to defendant from plaintiff on the ground of plaintiff's extreme cruelty. In said decree the court approved a property settlement agreement (hereinafter the "Agreement") entered into between the parties. The decree provided that plaintiff and defendant were to perform the Agreement according to its terms, and jurisdiction was retained by the court for the purpose of enforcing the Agreement as required. A final judgment of divorce was entered by the court on May 24, 1968, decreeing, in part, that the parties were to comply with the terms of the Agreement as provided in the interlocutory decree.

Pursuant to the court's continuing jurisdiction reserved by the court, defendant thereafter filed a motion for an order establishing that she had exercised her rights under the Agreement to buy all the stock in Berkeley Cinema Guild, Inc., and in Rosed, Inc., held by plaintiff and defendant and requesting the court to compel specific performance of those provisions of the Agreement calling for the redemption or purchase of plaintiff's stock in the two corporations. After a hearing the motion was denied and this appeal by defendant ensued.

### The Facts and Contentions

Pursuant to the Agreement plaintiff received 60 percent of the stock of each of the two corporations as his separate property and defendant received 40 percent of said stock as her separate property. Paragraph 10 of the Agreement provides for the procedure to be followed in the event either spouse should wish to sell or purchase stock from the other without having reached an agreement as to the terms and price thereof. In pertinent part paragraph 10 contains the following provisions: ". . . (c) At any time either spouse may give to the other spouse . . . written notice that on or after the fifteenth subsequent calendar day, but prior to the twentieth subsequent calendar day, the party giving notice will state a price per share of the shares of each corporation, at which such shares shall be bought or sold. . . . [¶] (d) Within thirty (30) days after the price per share is thus stated, the other spouse shall give written notice of his or her election to buy the first spouse's shares, or to sell his or her shares to the first spouse,

at the price per share stated in the notice under part (c) hereof. . . . [¶] (e) If the 'other spouse' shall have failed to make an election as hereinabove provided, the first spouse may elect to buy the 'other spouse's' shares, or to sell his or her shares to the other spouse, at the price per share stated under part 'c' hereof, . . ."

On August 17, 1968, plaintiff submitted to defendant an "offer to purchase or sell" as follows:

"Pursuant to the Notice of Intention previously given, the undersigned, EDWARD LANDBERG, hereby offers to purchase the entire interest of ROSLYN LANDBERG in both Berkeley Cinema Guild, Inc. and Rosed, Inc. (40%), or sell his own interest in said corporations (60%) at a price of Forty-Five Thousand Dollars ($45,000.00) for 40% or Sixty-Seven Thousand Five Hundred Dollars ($67,500.00) for 60% with terms as provided in the 'Agreement' among Roslyn Landberg, Edward Landberg and the said corporations executed in triplicate on April 10, 1967, and with the following additional conditions:

"1. The buying stockholder shall have a credit against the initial required down payment (twenty percent (20%) of the purchase price) equal in amount to one-half (½) of the debts (approximately $11,000.00) now owing by Edward and Roslyn Landberg to said corporations.

"2. The net proceeds derived by Rosed, Inc. from litigation against Howard Davis and Associates, whether by judgment, settlement or otherwise, are to be divided between Edward and Roslyn Landberg in the same proportion as said persons' present interest in the two corporations bear one to the other (60%-40%). If for any reason Rosed, Inc. fails to agree to the division of said proceeds, the purchasing shareholder shall be individually liable to pay the selling shareholder his or her proportionate share of the said proceeds.

"3. The film notes written by Edward Landberg, Jackson Burgess and Pauline Kael, and copyrighted by Berkeley Cinema Guild, Inc. through December 31, 1968, may be forever used by both buyer and seller in publicizing film showings at any theatres owned or controlled by either party."

On September 11, 1968, defendant responded to the plaintiff as follows:

"In response to your letter of August 17, 1968, I advise you as follows:

"1. Condition (1) does not meet the provisions of Article 10 of the Agreement, which establishes a 'price per share' and payment of the 'price per share.' I have permitted the 'price per share' to be stated as a price in gross, but I have permitted no deviations from the payment provisions of the April 10, 1967, Agreement. The debts owed by Edward Landberg and

Roslyn Landberg to the corporations are, according to accounting advice, charges made against Edward Landberg and Roslyn Landberg for payments of taxes and other obligations for the account of the prime lease on the Cinema Theatre property. Thus these obligations are 60% your liability and 40% mine, under Article 18 and 24 of said Agreement. You are invited to confirm this through the corporations' accountant, Mr. Barron.

"Thus I will accept your proviso #1 with the modification that the credit be 60% if you sell, and 40% if I sell.

"2. Condition (2) is acceptable.

"3. Condition (3) does not properly relate to any right to make an offer to purchase or sell under the April 10, 1967, Agreement. I cannot interpret its scope or meaning as written, and since there is no authority for imposing such a condition, I disregard it. The subject matter thereof seems in any event fully covered by Articles 6.a., 6.d., 6.e. and 10.i. of said Agreement.

"Subject to the foregoing advices and to the conditions which follow, I hereby elect to BUY your shares of and interest in Berkeley Cinema Guild, Inc. and Rosed, Inc., pursuant to Article 10.d. of the Agreement of April 10, 1967. . . ."[3]

In response to defendant's letter plaintiff replied that he did not feel that her acceptance was valid because defendant had refused to accept the three additional conditions set forth in his offer. To this communication defendant responded on September 17, 1968 by telegram as follows: "Since you have raised a question whether my letter of September 11 is a valid election to buy, let this telegram again be notice to you that I have elected to buy your interests in Berkeley Cinema Guild, Inc. and Rosed, Inc. for $67,500.00. My position is that my acceptance of September 11 constitutes a valid election and acceptance of your offer dated August 17; but if it should be determined that the September 11 election is not valid, then this shall be the acceptance of your offer and election to buy your interests in said corporations. This election is in conformity with and subject to the governing provisions of the April 10, 1967 Agreement. I suggest that your attorney contact Mr. Melchior."[4]

On October 31, 1968, plaintiff's attorney sent a reply telegram to defendant's attorney which stated as follows: "Because of the failure to

---

[3]The reply then listed several "conditions" concerning the husband's good faith dealing with the corporations pending closing of the transaction, imposing upon him the duty to make a complete inventory of all corporate property, and various matters related to closing of the transaction.

[4]Mr. Melchior was the wife's attorney.

properly accept offer of Edward Landberg to sell his interest in Rosed Inc. and Berkeley Cinema Guild Inc., Edward Landberg declines to sell his interests to Roslyn Landberg or allow redemption of his stock by said corporations."

At the hearing defendant testified that when she received plaintiff's "offer to purchase or sell" of August 17, she wanted to buy plaintiff's shares but that she didn't understand the three conditions that were stated in the offer and didn't know what to do with them. Defendant testified further that it was to "straighten out the three conditions" that she wrote her letter of September 11, and that the "main point of writing this letter, . . . was to inform Mr. Landberg that I wanted to purchase his stock."

Defendant also testified at the hearing that the Monday following the mailing of her letter of September 11 plaintiff came into the office and said he was literally through with the business and that defendant "was in charge now" and that he then left. A day or two later plaintiff telephoned defendant and told her he didn't feel that defendant's acceptance to purchase the stock was valid because defendant did not accept the three conditions he put down in his letter.

Defendant contends that her letter of September 11 was a valid acceptance of plaintiff's offer contained in his letter of August 17. Alternately, she argues that her telegram of September 17 constituted an unqualified acceptance of the offer. Defendant also contends that in any event plaintiff is estopped by his conduct from avoiding the contract.

### Offer and Acceptance

In considering defendant's contention with respect to her acceptance of plaintiff's offer we reiterate certain basic principles of the law of contract which she acknowledges. ■ These are (1) a valid acceptance must be absolute and unqualified (Civ. Code, § 1585), and (2) qualified acceptance constitutes a rejection terminating the offer; it is a new proposal or counteroffer which must be accepted by the former offeror now turned offeree before a binding contract results. (Civ. Code, § 1585; *Wristen* v. *Bowles,* 82 Cal. 84, 87 [22 P. 1136]; *Meux* v. *Hogue,* 91 Cal. 442, 448 [27 P. 744]; *Niles* v. *Hancock,* 140 Cal. 157, 161 [73 P. 840]; *King* v. *Stanley,* 32 Cal.2d 584, 588 [197 P.2d 321]; *Smith* v. *Holmwood,* 231 Cal. App.2d 549, 552 [41 Cal.Rptr. 907].)

Defendant contends that plaintiff's letter of August 17 did not constitute an offer which was to be accepted on its own terms or not at all, but it was the performance of an obligation under the Agreement, i.e., the obligation that in case either spouse wished to buy or sell the other's stock

the procedure provided for in the Agreement must be followed. In essence defendant asserts that plaintiff could only make an offer in conformity with the terms of the Agreement and that the imposition of any other terms or conditions as part of the offer was ineffective and added nothing to the offer that had to be made in accordance with the Agreement.

Adverting to paragraph 10 of the Agreement we perceive that it essentially provides that if either party wishes to sell his or her shares in both corporations, or to purchase the shares therein of the other spouse, he or she (the first spouse) shall give to the other spouse written notice of the price per share at which such shares shall be bought or sold; that within 30 days after the price per share is thus stated the spouse shall give written notice of his or her election to buy the shares of the first spouse or to sell his shares to the first spouse at the price stated in the notice first given; and that if the "other spouse" shall fail to make an election as so provided, the first spouse may elect in writing to buy the other spouse's shares or to sell his or her shares to the other spouse at the price stated in the notice first given.

Paragraph 10 of the Agreement, with which we are here particularly concerned, provides for an option. ■ "An option is a *contract* to keep an offer open for a prescribed period; and, when consideration is given, the offer is *irrevocable* during that period." (1 Witkin, Summary of Cal. Law (1960) § 51, p. 57.) It has also been defined as " 'a mere right of election acquired by one under a contract to accept or reject a present offer within the time therein fixed.' " (*Transamerica Corp.* v. *Parrington,* 115 Cal.App.2d 346, 352 [252 P.2d 385]; *Ware* v. *Quigley,* 176 Cal. 694, 698 [169 P. 377]; 1 Witkin, Summary of Cal. Law (1960) p. 57; 1 Williston, Contracts, § 61A, p. 198; 1A Corbin, Contracts, § 260, p. 466, § 263, p. 498; *Warner Bros. Pictures* v. *Brodel,* 31 Cal.2d 766, 772 [192 P.2d 949, 3 A.L.R.2d 691]; *Kelley* v. *Rouse,* 188 Cal.App.2d 92, 96 [10 Cal.Rptr. 235]; *Riverside Fence Co.* v. *Novak,* 273 Cal.App.2d 656, 660 [78 Cal.Rptr. 536].) In *Warner,* the nature of an option is stated thusly: ". . . an option agreement is a contract distinct from the contract to which the option relates, since it does not bind the optionee to perform or enter into the contract upon the terms specified in the option. [At pp. 771-772.] . . . [¶] The creation of the final contract requires no promise or other action by the optionor, for the contract is completed by the acceptance of the irrevocable offer of the optionor by the optionee. 'The contract has already been made, as far as the optionor is concerned, but is subject to conditions which are removed by the acceptance.' [Citations.] . . . an option contract involves on the part of the optionor a unilateral promise to perform the obligations of the contract to which the option relates. [Citations.]" (At p. 773; see also *Dawson* v. *Goff,* 43 Cal.2d

310, 316-317 [273 P.2d 1]; *Caras* v. *Parker*, 149 Cal.App.2d 621, 626 [309 P.2d 104].)

In *Flickinger* v. *Heck*, 187 Cal. 111, 113-114 [200 P. 1045], the manner in which an option operates is stated thusly: "An option contract may be regarded as embodying an offer. When the optionee, or person to whom the offer is made, signifies his desire to accept in accordance with the terms of the option, the optioner, or person making the offer, becomes obligated to perform. This acceptance of the offer contained in the option contract is called 'election' and it gives rise to a subsequent contract between the parties to buy or sell, or perform whatever other acts have been specified in the option contract. [Citation.] 'The particular act or acts which constitute an election may be fixed by the terms of the option, as also the time when, the place where, and the person to whom it shall be made.' [Citation.] The language of the contract itself controls as to what act or acts constitute an election."

■ As in the case of other contracts, the offer embodied in the option contract must be accepted in the terms in which it is made. (*Alexander* v. *Bosworth*, 26 Cal.App. 589, 597 [147 P. 607]; *Hayward Lbr. & Inv. Co.* v. *Const. Prod. Corp.*, 117 Cal.App.2d 221, 227 [255 P.2d 473]; *Cicinelli* v. *Iwasaki*, 170 Cal.App.2d 58, 67 [338 P.2d 1005]; *Wightman* v. *Hall*, 62 Cal.App. 632, 634 [217 P. 580].) Accordingly, the acceptance is required to be identical with the offer; it must be unconditional and not add any new terms thereto. (*Robbins* v. *Pacific Eastern Corp.*, 8 Cal.2d 241, 276 [65 P.2d 42]; *Palmer* v. *Fleming*, 167 Cal.App.2d 108, 111 [334 P.2d 23]; *State of California* v. *Agostini*, 139 Cal.App.2d 909, 912 [294 P.2d 769]; *Flickinger* v. *Heck*, *supra*, 187 Cal. 111, 113-114.) Therefore, if the acceptance contains conditions not embraced in the offer or adds new terms thereto, there is no meeting of the minds (*Robbins* v. *Pacific Eastern Corp.*, *supra*) and the purported acceptance may be ignored by the optionor. (*Carney* v. *Heisch*, 67 Cal.App. 465, 467 [227 P. 780].) As succinctly stated in *Riverside*, "The acceptance must be in accordance with the terms of the option agreement and must be free of conditions which the optionor is not bound to perform. [Citations.] 'Nothing less will suffice unless the optionor waives one or more terms of the option.' [Citations.]" (273 Cal.App.2d at pp. 660-661.)

■ If the optionee changes the terms of the offer embodied in the option agreement "the alteration of such terms, or the addition of any change or limitation, is tantamount to a rejection of the original offer and the making of a counter offer; . . ." (*Alexander* v. *Bosworth*, *supra*, 26 Cal.App. 589, 597; *Hayward Lbr. & Inv. Co.* v. *Const. Prod. Corp.*, *supra*, 117 Cal. App.2d 221, 227.)

In the light of these principles we proceed to discuss the nature of the option provided for in the instant case. In doing so we first take cognizance of *Valashinas* v. *Koniuto,* 308 N.Y. 233 [124 N.E.2d 300], upon which defendant places strong reliance. This is the only case which has come to our attention that is similar to our case. In *Valashinas* a partnership agreement contained a provision that if either of the two partners should desire to dissolve the partnership, he should give written notice of his intention to the other party, stating in the notice the sum of money for which he was willing either to sell his interest in the partnership or to buy the other partner's interest. The agreement provided that the partner to whom notice was given had 90 days to accept either one of the offered alternatives. It was further provided that if the partner receiving such notice failed to give notice of acceptance of either alternative within 90 days, the partner making the offer had the power to bind the other partner either to buy or sell upon the stated terms. In holding that the partner to whom the offer was made properly exercised his option by giving notice of acceptance of the other's offer to buy on the stated terms, the court observed that the notice given by the partner making the offer and the notice of acceptance by the other partner did not constitute an "offer" and "acceptance" in the conventional sense of contract making, but were, indeed, mere steps in the performance of the partnership contract, "an exercise by each party, in turn, of an option provided for by that contract." (308 N.Y. at pp. 239-240 [124 N.E.2d at p. 303].)

Professor Corbin, in his discussion of "option contracts," analyzes *Valashinas* and observes that the provisions in the partnership agreement providing that one partner could state the sum of money for which he was willing to either sell his interest in the partnership or buy the other partner's interest, and the provisions giving the other partner an election to accept either one of the offered alternatives and providing for the first partner's power to bind the other partner in the event of his failure to make an election, did not in themselves create any option either to buy or sell. He notes, moreover, that in the absence of such provisions either partner could make such an alternative offer. According to Corbin the option was created by the offering partner in the partner receiving the first notice (the offeree) when the offer was made and was an option given the offeree to accept on the stated terms or to reject the offer outright, and in the case of acceptance, an option between buying and selling. Corbin observes, further, that the provision dealing with the failure of the offeree to accept within 90 days had the effect of creating in the offering partner himself an option to buy or to sell on his own already stated terms. (1A Corbin, Contracts, § 268, at p. 555.)

The last observation made by Corbin with respect to *Valashinas* is

consistent with his observation that "It is possible that in a single contract both parties thereto shall have an option" and that such a double option contract "is a bilateral contract, binding on both parties and not revocable by either of them. Each promise is a sufficient consideration for the other." (1A Corbin, Contracts, § 268, at p. 551.)

▌ Applying Corbin's analysis of *Valashinas* to the provisions of paragraph 10 of the Agreement, we conclude that these provisions do not in and of themselves create an option to buy or sell the subject shares.[5] The alternative offer therein provided for could have been made by either party in the absence of such provisions. As we construe the subject provisions, an option is created when one spouse gives to the other a notice stating "a price per share of the shares of each corporation, at which such shares shall be bought or sold." The subject provisions do not constitute an agreement that either spouse is obligated to make an offer but they do constitute a contract that if an offer is made it shall be made and acted upon in a particular manner.

In the instant case an offer was made to defendant by plaintiff in his letter of August 17 wherein plaintiff offered to purchase defendant's "entire interest" in the two corporations for $45,000 or to sell "his own interest" in said corporations to defendant for $67,500 subject to three conditions. These conditions were: (1) that the buying spouse would have a credit against the 20 percent downpayment specified in subdivision (g) of paragraph 10 equal to one-half of the debts owing by the spouses to the corporations; (2) that the net proceeds derived in certain litigation by Rosed, Inc. would be divided in proportion to the spouses' present interest in the two corporations (i.e., 60 percent—40 percent), and that if Rosed, Inc. failed to agree to the division of said proceeds, the purchasing spouse would be individually liable to pay the selling spouse his or her proportionate share of such proceeds, and (3) that certain "film notes" written by plaintiff and others could be forever used by both spouses in publicizing film showings at any theaters owned or controlled by either party.

▌ The foregoing offer does not constitute the creation of the option contemplated in the Agreement because it was not made according to the provisions of paragraph 10 of the Agreement. Under these provisions

---

[5]The basic provisions of paragraph 10 of the Agreement are almost identical to those in the *Valashinas* agreement. In the present case it is provided that if a spouse wishes to sell his or her shares or to buy the other's shares, the first spouse is to give the other spouse written notice stating a price per share at which such shares shall be bought or sold. The other spouse is given 30 days within which to elect to buy the first spouse's shares or to sell his or her shares at the stated price. If the other spouse does not signify his or her election within that period the first spouse may elect to buy the other spouse's shares or to sell his or her shares at the stated price.

the option could only be created by stating a price per share at which the stock of the corporations was to be bought or sold. Although we do not perceive any deficiency because the stated price was in gross rather than in terms of a price per share, the conditions attached to the offer went beyond the provisions of the Agreement. Accordingly, since the offer was not made in the manner specified in the Agreement, it was a nullity insofar as it purported to create the option therein provided for and defendant was entitled to reject it or to ignore it.

Instead of ignoring or rejecting in toto the offer made by plaintiff in his letter of August 17, defendant responded in her letter of September 11 that she elected to buy plaintiff's shares at the stated price subject to condition (2) of plaintiff's offer, but not in accordance with conditions (1) and (3). With respect to condition (3), defendant stated she was disregarding it because under the Agreement there was no authority for imposing such condition and also because it was covered by other provisions of the Agreement. Regarding condition (1), defendant stated that she accepted the condition with the modification that the credit for debts against the downpayment be 60 percent if plaintiff sold his shares and 40 percent if defendant sold her shares.

As we view plaintiff's offer of August 17, it was not the creation of the option provided for in the Agreement. That option is one which could be invoked by either spouse if they could not amicably agree among themselves on the sale by one and the purchase by the other of the shares of stock. The Agreement did not impose any obligation on either party to buy or sell, nor did it set any price on the stock. Consequently, a party could bargain for additional consideration in exchange for his or her willingness to purchase or sell. Here plaintiff was not purporting to create the "take it or leave it" option provided for in the Agreement which either spouse could invoke where one was desirous of buying the other's interest or selling his or her interest to the other and a price could not be amicably agreed upon. Rather, he was giving defendant a *different* option, i.e., an option to buy or sell the shares at the stated price upon three conditions not provided for in the option contract set out in the Agreement. Moreover, it is apparent from the offer that the stated price was predicated upon the acceptance of the three conditions. One of these conditions (condition (1)) sought to modify the provisions of the Agreement providing for the satisfaction of the debts owing by the spouses to the corporations.[6]

---

[6]Two provisions of the Agreement (paragraphs 18 and 24) provide that the spouses are to assume corporate debts in the same ratio as their ownership in the corporations, i.e., plaintiff 60 percent, and defendant 40 percent. Condition (1) of the offer stipulated that the debts of the spouses to the corporations be assumed on a 50-50 basis.

Neither party was restricted by the Agreement from giving the other an option to buy or sell on terms different from those delineated in the option provided for in the Agreement if the parties were agreeable. Moreover, the Agreement specifically provides that the option contract therein stipulated may be invoked by either spouse if the spouses are unable to agree among themselves on the purchase by one and the sale by the other of said stock.[7]

Plaintiff, in essence, was attempting to secure an agreement from defendant to an offer submitted by him in the form of an option on stated terms and conditions which sought to utilize the option performance procedure set out in the Agreement and at the same time sought a modification of the Agreement with respect to the debts owed by the spouses to the corporations. Defendant asserts that she could disregard the conditions attached to plaintiff's offer as surplusage and treat the offer as having been made without such conditions. We find no merit in this contention. Plaintiff, as already pointed out, was privileged to make such an offer even though he could not compel defendant to act on it since it was not in conformity with the option provisions of the Agreement. As we view the situation defendant was justified in ignoring plaintiff's offer or to reject it in toto. She was also entitled to make a counteroffer, or, if she desired to act within the strict confines of the option provisions of the Agreement, to state a price at which shares would be bought or sold in which case an option would have been created by her under the Agreement.

We observe, moreover, that defendant did not entirely ignore the conditions attached to plaintiff's offer. She accepted the offer subject to condition (2) and rejected conditions (1) and (3). It seems inconsistent that defendant can assert that she could treat the option as one made under the Agreement insofar as the stated price is concerned and then elect to pick and choose the conditions attached to the offer which were satisfactory to her. Accordingly, it is clear that in her letter of September 11 defendant purported to give recognition to the offer by an acceptance in terms different from those expressed in the offer.

Since defendant's letter of September 11 did not accept plaintiff's offer of August 17 unconditionally or on the terms in which it was made, there was no acceptance of the offer. Moreover, defendant's letter of September

---

[7]Paragraph 10 of the Agreement, in pertinent part, specifically provides: ". . . If at any time . . . either spouse wishes to sell his or her shares in both corporations, or to purchase the shares therein of the other spouse, and unless the spouses shall then have informally agreed among themselves about a purchase by one and a sale by the other of such stock and about the price and terms thereof, the following procedure shall be followed: . . ." Paragraph 10 thereafter sets out the procedure whereby an option to buy or sell is created and performed upon stating a price at which shares shall be bought or sold.

11 was a rejection of plaintiff's offer. ▮ It is well settled that an attempt to exercise an option upon terms varying from those offered is tantamount to the rejection of the original offer and the making of a counteroffer. (*Alexander* v. *Bosworth, supra*, 26 Cal.App. 589, 597; *Hayward Lbr. & Inv. Co.* v. *Const. Prod. Corp., supra*, 117 Cal.App.2d 221, 227; see Civ. Code, § 1585.) The only exception to this rule is where the optionor in his original offer, or the optionee in his counteroffer, states that, in spite of the counteroffer, the original offer shall not be terminated. (*People* v. *Twedt*, 1 Cal.2d 392, 397 [35 Cal.Rptr. 324]; see *Born* v. *Koop*, 200 Cal.App.2d 519, 524-525 [19 Cal.Rptr. 379].) The exception is not applicable here. We observe, moreover, that defendant's counteroffer was not accepted by plaintiff who, in response to defendant's letter of September 11, advised defendant that he did not feel her acceptance was valid because she had refused to accept the conditions set forth in his original offer.

Defendant argues that, in any event, her acceptance of plaintiff's original offer made in her telegram of September 17 constituted an unqualified acceptance of the original offer. This assertion acknowledges that plaintiff was privileged to make an offer in the terms of his letter of August 17. There is no doubt that the telegram purported to unconditionally accept plaintiff's offer made in said letter. It was also made within the 30-day period provided in paragraph 10 of the Agreement, whose option election procedure plaintiff had invoked in connection with the making of his offer. ▮ However, defendant's purported acceptance of September 17 was a nullity because there was no offer extant which she could accept. Her qualified acceptance of September 11 constituted a rejection of plaintiff's original offer and put an end to it. (*Niles* v. *Hancock, supra*, 140 Cal. 157, 161; *Devereaux* v. *Harper*, 210 Cal.App.2d 519, 524 [26 Cal.Rptr. 837]; *Stanley* v. *Robert S. Odell and Co.*, 97 Cal.App.2d 521, 534 [218 P.2d 162].) As stated in *Stanley*, "The rejection of an offer kills the offer." (At p. 534.) It is well settled that when an offer under an option contract has been rejected, the party rejecting cannot subsequently, at his option, accept the rejected offer and thus convert the same to an agreement by acceptance. (*Niles* v. *Hancock, supra; Stanley* v. *Robert S. Odell and Co., supra; Title Insurance & Guaranty Co.* v. *Hart*, 160 F.2d 961, 966; *Jones* v. *Moncrief-Cook Co.*, 25 Okla. 856, 865 [108 P. 403, 407].) Accordingly, the rejection in the instant case was irrevocable.

In the instant case defendant's letter of September 11 was not a mere requested modification of plaintiff's original offer (*Berthiaume* v. *John Doe*, 22 Cal.App. 78, 80 [133 P. 515]; *First Nat. Exch. Bank* v. *Roanoke Oil Co.*, 169 Va. 99, 115 [192 S.E. 764, 770-771]), or the mere interpreta-

tion by defendant of what the option required on her part (*Title Insurance & Guaranty Co.* v. *Hart, supra,* 160 F.2d at p. 966), or an erroneous attempt to accept (*McCormick* v. *Stephany,* 61 N.J. Eq. 208, 214-216 [48 A. 25, 27-28]), which would not have terminated the power to accept as created by the option, but a counteroffer or acceptance on terms varying from the original offer amounting to a rejection of the offer. Nor can it be said that defendant's letter of September 11 constituted a "grumbling acceptance." While defendant may have "grumbled," she made it clear and unequivocal that she was not accepting plaintiff's offer according to its terms.

### Estoppel

Defendant also contends that plaintiff was estopped by his conduct under the doctrine of promissory estoppel from avoiding "his acquiescence" in her purchase of his interest in the corporations on the basis that "she took extensive action in reliance thereon." ■ In considering this contention we observe that the doctrine of promissory estoppel is based on the principle that "A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." (Rest., Contracts, § 90; *Drennan* v. *Star Paving Co.,* 51 Cal.2d 409, 413 [333 P.2d 757].)

The facts as alleged in defendant's opening brief do not set out any evidence of the alleged "extensive action" upon which reliance is predicated. The only evidentiary support urged by defendant in her statement of facts purporting to touch upon the claim of estoppel is the testimony that, on the Monday following the mailing of defendant's letter of September 11, plaintiff stated he was literally through with the business and that defendant "was in charge now" and that he then left. Defendant's factual statement discloses, however, that a day or two later plaintiff told defendant that he didn't feel that defendant's acceptance was valid because she had not accepted the conditions he had put down in his letter. The statement of facts discloses, further, that it was after the making of these statements that defendant sent the telegram of September 17 by which she purported to unconditionally accept plaintiff's original offer.

■ The burden is upon the party alleging estoppel to prove it. (*Domarad* v. *Fisher & Burke, Inc.,* 270 Cal.App.2d 543, 556 [76 Cal. Rptr. 529]; *In re Mercantile Guaranty Co.,* 263 Cal.App.2d 346, 356 [69 Cal.Rptr. 361].) ■ Estoppel is not favored by the courts, and it is incumbent upon one who advances it to prove its dominant essentials,

leaving nothing to surmise or questionable inference. (*General Motors Accept. Corp.* v. *Gandy,* 200 Cal. 284, 297 [253 P. 137]; *Hammond Lumber Co.* v. *Weeks,* 105 Cal.App. 315, 319 [287 P. 573]; *Augustine* v. *Trucco,* 124 Cal.App.2d 229, 244 [268 P.2d 780].) ■ Generally, whether estoppel exists is a question of fact and ordinarily the trial court's determination is binding on appeal unless the contrary conclusion is the only reasonable one to be drawn from the facts. (*In re Mercantile Guaranty Co., supra; Albers* v. *County of Los Angeles,* 62 Cal.2d 250, 266 [42 Cal.Rptr. 89, 398 P.2d 129].)

The record does not disclose whether the issue of estoppel was tendered to the court below. No findings were made or requested on that issue. In view of the court's determination in favor of plaintiff we are entitled to imply, in the absence of specific findings, that the trial court found against defendant on the issue of estoppel and that the court concluded that any detriment suffered by defendant was entirely the result of her own erroneous assumption that her "acceptances" were legally sufficient. Moreover, there is no evidence in the record indicating that plaintiff misled defendant to her detriment, nor is there any evidence that any detrimental change of position was evidenced by any promise on the part of plaintiff. Rather, the record discloses that the parties were bargaining at arms length in an attempt to arrive at a bargain mutually acceptable to both.[8]

The order is affirmed.

Sims, J., and Elkington, J., concurred.

A petition for a rehearing was denied May 4, 1972, and the opinion was modified to read as printed above. Appellant's petition for a hearing by the Supreme Court was denied May 31, 1972.

---

[8]If we look to the record and consider additional undisputed facts not contained in defendant's statement of facts, we find evidence presented by defendant that plaintiff allgedly told his employees that it looked as if defendant had elected to buy his shares and his statement to defendant that "*if* you have bought the business or *if* you have elected to buy the business, you will have to run it." (Italics added.)